Filed 4/2/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GUADALUPE ARROYO et al., | B245659 |
| Plaintiffs and Appellants, | (Los Angeles County |
| v. | Super. Ct. No. BC484024) |
| JOHN J. PLOSAY III et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rolf M. Treu, Judge.  Affirmed in part; reversed in part.

Law Offices of Scott E. Schutzman and Scott E. Schutzman for Plaintiffs and Appellants.

Reback, McAndrews, Kjar, Warford, Stockalper & Moore, James J. Kjar, Brian T. Selogie and Ryan P. Deane for Defendant and Respondent John J. Plosay III.

Ryan, Datomi, Richard J. Ryan and Dawn Cushman for Defendant and Respondent White Memorial Medical Center.

On July 26, 2010, Maria de Jesus Arroyo (the decedent) died at White Memorial Hospital (the Hospital) after being transported there by ambulance and treated for cardiac arrest by Dr. John J. Plosay. On May 3, 2012, the decedent's husband, Guadalupe Arroyo, and the decedent's eight children[1] filed the present action against the Hospital and Dr. Plosay, alleging three causes of action, the first two of which were based on facts diametrically opposed to those underlying the alternative third cause of action.[2]

The first two claims, medical negligence (brought as a survivorship action by plaintiff Guadalupe Arroyo alone) and wrongful death (brought on behalf of all plaintiffs) were based on allegations that the Hospital staff and Dr. Plosay prematurely declared the decedent dead, after which she was placed in a compartment in the Hospital morgue while still alive, inflicted disfiguring injuries to her face while trying to escape, and ultimately froze to death. Plaintiffs alleged that they did not discover these facts, and could not reasonably have discovered them, until December 8, 2011, when an expert they retained in a prior dismissed action against the Hospital (which was based solely on the alleged disfigurement of the decedent's remains after death) reviewed discovery material in the prior case and opined, inter alia, that the decedent's injuries occurred pre-mortem. The third cause of action, styled negligence (and brought on behalf of all plaintiffs), was based on the alternative factual premise (the premise underlying the prior action

---

[1]    The children are Armando Arroyo, Graciano Arroyo, Artemio Arroyo, Emilio Arroyo, Willibaldo Arroyo, Maria F. Gutierrez, Leticia A. Jimenez, and Maria Carmen Zamora.

[2]    "When a pleader is in doubt about what actually occurred or what can be established by the evidence, the modern practice allows that party to plead in the alternative and make inconsistent allegations." (*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1402.)

2

against the Hospital) that after the decedent died from cardiac arrest, her body was mishandled by Hospital staff  when placing it in the morgue, resulting in facial disfigurement that could not be masked by the mortuary whose workers first observed the injuries.

In sustaining two demurrers by the Hospital without leave to amend (one to the medical negligence and wrongful death claims, the other to the negligence claim after amendment), the trial court concluded that the one-year limitation period of Code of Civil Procedure section 340.5,[3] applicable to actions for professional negligence against a health care provider, applied to all claims and commenced on or about July 26, 2010, the date plaintiffs learned of the decedent's death and the disfiguring injuries to her face.  Therefore, the filing of this action on May 3, 2012, was untimely, and the court dismissed the action against the Hospital.  As to Dr. Plosay, by stipulation plaintiffs agreed that the trial court's ruling on the Hospital's demurrer to the medical negligence and wrongful death claims applied to him as well, and plaintiffs agreed to dismiss those claims, along with the negligence claim, as to him.  The court entered an order of dismissal based on the stipulation.

Plaintiffs appeal from the dismissals, contending that the trial court erred in concluding that their three claims were barred by section 340.5.  Assuming (as we must) that plaintiffs' allegations are true, we hold that they  do not show, as a matter of law,  that the one-year period of section 340.5 for the medical negligence and wrongful death claims began running on or about July 26, 2010.  First, the "injury" – a term of art encompassing the generic elements of wrongdoing, causation and harm (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 (*Norgart*))

---

[3]  All undesignated section references are to the Code of Civil Procedure.

– that plaintiffs then reasonably suspected was not the same "injury" as that underlying the medical negligence and wrongful death claims. Second, the facts alleged do not permit the conclusion, as a matter of law, that a reasonable investigation of all potential causes of the injury plaintiffs suspected at the time of the decedent's death would have uncovered the factual basis for the negligence and wrongful death claims before December 8, 2011, the date plaintiffs' expert in the prior action against the Hospital rendered his opinion. Therefore, the trial court erred in sustaining the Hospital's demurrer to these two causes of action, and we reverse the orders dismissing those claims as to the Hospital and Dr. Plosay.

As to the cause of action for negligence, we conclude that section 340.5 provides the applicable limitation period, because (1) facts subject to judicial notice (the Hospital's licensed status and administrative regulation) establish that placing the decedent's remains in the Hospital morgue falls within the definition of professional negligence, i.e., negligence in providing services for which the Hospital is licensed, and (2) section 340.5 is not limited to actions for injury caused to a patient, but rather applies to actions for injury by any party whose injury was a foreseeable result of the alleged professional negligence. Because the present action was filed more than one year after plaintiffs knew of or reasonably suspected their injury, the negligence claim is barred. On that basis, we affirm the trial court's dismissal of the negligence claim against the Hospital. We affirm the dismissal as to Dr. Plosay based on plaintiffs' stipulated dismissal of the claim as to him.

4

# BACKGROUND

*The Mutilation Action*

The case at issue in this appeal was not plaintiffs' first suit against the Hospital. Before filing the instant action on May 3, 2012, plaintiffs had filed suit against the Hospital on January 31, 2011.[4] For ease of reference, we (like the parties) refer to this action as the mutilation action.

The complaint in the mutilation action alleged that on July 26, 2010, the decedent was taken by ambulance to the Hospital, where she received treatment for cardiac arrest, acute myocardial infarction, and hypertension. Shortly after arrival, she was pronounced dead by hospital staff. When workers for the mortuary selected by the family came to pick up the body, they found it lying face down in the Hospital morgue. The decedent's nose was broken and her face had suffered lacerations and contusions – injuries that had not been present when she arrived at the Hospital or when the body was viewed by relatives after the declaration of death. The workers informed plaintiffs of the injuries to the decedent's remains, which the mortuary was unable to mask.

Plaintiffs alleged causes of action for: (1) negligence per se (based on Health & Saf. Code, § 7052, subd. (a), which makes it a felony to "willfully mutilate[] . . . any remains known to be human, without the authority of law"), (2) ordinary negligence, and (3) intentional infliction of emotional distress. After the trial court denied plaintiffs' ex parte request to shorten time to hear a motion to amend the complaint and summarily adjudicated the claims for negligence per se and intentional infliction of emotional distress in the Hospital's favor, plaintiffs

---

[4] We take judicial notice of the complaint and records of relevant proceedings in the mutilation action (Evid. Code, § 452, subd. (d)(1), which are included in the record on appeal.

dismissed the remaining claim for negligence without prejudice on January 20, 2012, just before trial.

*The Current Lawsuit*

On May 3, 2012, plaintiffs filed the instant lawsuit, naming the Hospital and Dr. Plosay as defendants. The complaint acknowledged the prior filing of the mutilation action, and in part alleged facts substantially similar to the facts alleged in that action. Thus, the complaint in the present case alleged that Dr. Plosay and the Hospital staff pronounced the decedent dead shortly after she arrived to be treated for cardiac arrest, acute myocardial infarction, and hypertension, that the body was laid out for plaintiffs to view and pay their respects before it was taken to the Hospital's morgue, and that the decedent's face then had no injuries. It further alleged that when the mortuary workers examined the decedent's body in the Hospital's morgue, it was lying face down. After the body was taken to the mortuary, the workers discovered that the decedent's nose was broken and the face showed lacerations and contusions. Plaintiffs became aware of the disfiguring of the remains when contacted by the mortuary, and the mortuary was unable to mask the injuries.

However, whereas the mutilation action was premised solely on the injuries having occurred after death, plaintiffs now alleged that during discovery in the mutilation action, an expert, relying on deposition testimony, declarations of the Hospital personnel, and the decedent's medical records, opined that the decedent's remains were not disfigured after death. Rather, according to the expert, the decedent "had been prematurely declared dead" by Dr. Plosay and the Hospital staff, "frozen alive" in the Hospital's freezer, "eventually woke up" due to the extreme cold, and "damaged her face and turned herself face down as she struggled

6

unsuccessfully to escape her frozen tomb." To avoid the statute of limitations, plaintiffs alleged that they did not discover that the decedent had been frozen alive until the expert gave his opinion on December 8, 2011, and could not have discovered that fact earlier by the exercise of reasonable diligence.

The complaint alleged three causes of action against the Hospital and Dr. Plosay. The first two claims, for medical negligence (brought by plaintiff Guadalupe Arroyo alone, as successor in interest to the decedent) and for wrongful death (brought on behalf of all plaintiffs), were based on the defendants' alleged negligence in prematurely declaring the decedent dead and allowing her to be frozen alive, resulting in her death. The third claim (also brought on behalf of all plaintiffs) was nearly identical to the negligence claim brought in the mutilation action, and was based on the alternative theory that the defendants mishandled the decedent's remains post-mortem in transporting the body to the Hospital's morgue, or by manipulating her body there, resulting in disfigurement to her face.

Attached to the complaint was a declaration under section 377.32 by plaintiff Guadalupe Arroyo in which he declared that the decedent died on July 26, 2010, and that he is the decedent's successor in interest.[5] Attached as an exhibit to the declaration was a copy of the decedent's death certificate, which stated that the date of death was July 26, 2010, that it occurred at the Hospital, and that the immediate cause of death was cardiac arrest, supplemented by acute myocardial

---

[5]  Section 377.32, subdivision (a) provides: "The person who seeks to commence an action or proceeding or to continue a pending action or proceeding as the decedent's successor in interest under this article, shall execute and file an affidavit or a declaration under penalty of perjury under the laws of this state stating" certain listed facts. A copy of the death certificate must be attached to the affidavit or declaration. (§ 377.32, subd. (c).)

7

infarction and hypertension. A physician other than Dr. Plosay was the certifying physician.

*The Hospital's Demurrer*

The Hospital demurred to the complaint, challenging all three causes of action on the ground that they were barred by the one-year statute of limitations of section 340.5 ["an action for injury or death against a health care provider based upon such person's alleged professional negligence" must be commenced within "one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury"].)[6] According to the Hospital, the first two causes of action – medical negligence and wrongful death – were barred because plaintiffs were aware of the disfiguring injuries to the decedent's face on or about July 26, 2010, the date she was pronounced dead, and such knowledge placed them on notice of potential wrongdoing by the Hospital. However, they did not file the instant complaint until May 3, 2012, much longer than one year after their discovery of the potential wrongdoing. Similarly, the Hospital argued that the one-year limitation period had expired for the third cause of action for negligence in the handling of the remains, because it was identical to the claim in the mutilation action, which had been dismissed, and the claim was not timely revived by the current action filed on May 3, 2012.

In opposing the Hospital's demurrer, plaintiffs conceded that section 340.5 applied to the medical negligence and wrongful death causes of action, but argued that (as alleged in the complaint) they could not have reasonably discovered the injury underlying those claims before December 8, 2011, when their expert in the

---

[6]    The Hospital also raised other grounds, which are not discussed on the merits by the parties and which we do not address.

mutilation action first opined the decedent was alive when the facial injuries occurred. Because the complaint was filed on May 3, 2012, less than one year later, the claims were timely. As for the third cause of action plaintiffs argued that the two-year limitation period for ordinary negligence applied, and therefore the claim was not barred.

*Trial Court's Ruling*

As here relevant, the trial court sustained the Hospital's demurrer without leave to amend as to the causes of action for medical negligence and wrongful death, agreeing with the Hospital that section 340.5 barred the claims, because plaintiffs' knowledge of the decedent's facial injuries started the one-year limitation period running, and the instant complaint was filed more than one year later.[7] As to the third cause of action for negligence in the mutilation of the body, the court sustained the demurrer, but granted leave to amend.

*The First Amended Complaint*

Plaintiffs filed a first amended complaint. The only material changes in the first amended complaint were that the third cause of action for negligence was amended to be brought on behalf of all plaintiffs except Guadalupe Arroyo as the decedent's successor in interest, and that the claim no longer incorporated by reference facts specifically contained in the paragraphs of the first two causes of action.

---

[7] Although plaintiffs requested leave to amend to allege that fraud by the Hospital in concealing the cause of death tolled the limitation period, the trial court denied leave.

9

*The Hospital's Demurrer to the First Amended Complaint*

The Hospital demurred to the negligence cause of action on the ground that it was barred by section 340.5. To show that the claim was for professional negligence within the meaning of section 340.5, the Hospital asked the court to take judicial notice of a copy of the Hospital's license issued by the California Department of Public Health in effect as of the date of the decedent's death, July 26, 2010, which was attached to the demurrer. The license certified the Hospital as a general acute care hospital with a capacity of 293 beds. The Hospital also asked the court to take judicial notice of, inter alia, California Code of Regulations, Title 22, section 70829, which provides that hospitals "with a licensed bed capacity of 100 or more shall maintain a well-ventilated morgue with autopsy facilities" (subd. b), and "[r]efrigerated compartments shall be maintained if human remains are held unembalmed" with an air temperature not higher than 45 degrees Fahrenheit (subd. (c)).

Based on these facts subject to judicial notice, the Hospital argued that the injuries to the decedent's remains occurred during the provision of services for which the Hospital was licensed. In particular, the first amended complaint alleged that the injuries occurred when the remains were transported to or manipulated at the Hospital's morgue. Because as a condition of its license the Hospital was required to maintain a refrigerated morgue, the Hospital argued that the facial injuries to the remains inflicted on the way to or in the morgue necessarily fell within the scope of services the Hospital was required to perform. Thus, the third cause of action was governed by section 340.5, and was barred because the claim was filed in the instant action more than one year after discovery of the decedent's facial disfigurement.

10

In opposition to the Hospital's demurrer, plaintiffs argued that section 340.5 did not apply to the Hospital's mishandling of the decedent's remains, because that statute only applies to actions for death or injury inflicted on the patient of the health care provider, whereas here the decedent was dead when the facial injuries occurred.

*Stipulation Between Plaintiffs and Dr. Plosay*

Before the hearing on the Hospital's demurrer, plaintiffs and Dr. Plosay entered a stipulation in which they agreed that the trial court's earlier ruling sustaining without leave to amend the Hospital's demurrer to the medical negligence and wrongful death causes of action applied "with equal force and effect" to Dr. Plosay. Plaintiffs agreed to dismiss those claims against Dr. Plosay, and also to dismiss the third cause of action for negligence as to him. Pursuant to the stipulation, before the hearing on the Hospital's demurrer, the court entered an order of dismissal as to all claims against Dr. Plosay.

*Ruling on the Hospital's Demurrer*

The trial court sustained the Hospital's demurrer without leave to amend and entered an order of dismissal as to the entire action as to the Hospital. The court reasoned that plaintiffs were alleging that the Hospital's negligence in the handling of the decedent's remains proximately caused emotional injury to them, and that such injury was encompassed by section 340.5.

## DISCUSSION

"Because this case comes to us on a demurrer for failure to state a cause of action, we accept as true the well-pleaded allegations in plaintiffs' . . . complaint.

11

'"We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation]' [Citation.]" (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.) Only when the facts alleged, or matters subject to judicial notice, demonstrate as a matter of law that the statute of limitations has expired can a demurrer be sustained on that ground. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.)

I.      *The Causes of Action for Medical Negligence and Wrongful Death*

The trial court sustained the Hospital's demurrer to the medical negligence and wrongful death claims alleged in plaintiff's complaint on the ground that they were barred by the one-year limitation period of section 340.5. Plaintiffs contend that the court erred, because, as alleged in the complaint, they could not have reasonably discovered a factual basis for those claims before December 8, 2011, when their retained expert, on review of evidence obtained in discovery in the mutilation action, opined that the decedent's remains were not disfigured after death, but rather that the decedent was alive when placed in the Hospital's morgue and injured herself trying to escape. Taking the allegations of the complaint as true, we conclude that it cannot be said as a matter of law that the one-year period began running on or about July 26, 2010, the date of the decedent's death. First, the injury that plaintiffs reasonably suspected at that time was not the same injury underlying the medical negligence and wrongful death claims. Second, the facts alleged in the complaint do not permit the conclusion, as a matter of law, that a reasonable investigation of all potential causes of the injury plaintiffs suspected at

12

the time of the decedent's death would have uncovered the factual basis for the negligence and wrongful death claims before December 8, 2011, the date plaintiffs' expert first rendered his opinion. Therefore, the trial court erred in sustaining the Hospital's demurrer to these two causes of action.

In discussing this issue, we note (as previously discussed) that Dr. Plosay never demurred to the claims on this ground; the claims were dismissed against him based on a stipulation that the trial court's ruling on the Hospital's demurrer applied equally to him. Thus, on appeal Dr. Plosay can raise only issues presented by the Hospital's demurrer, and his respondent's brief on appeal essentially mirrors the Hospital's. Therefore, we refer only to contentions made by the Hospital on appeal, with the understanding that Dr. Plosay makes the same arguments.

Section 340.5, a provision of the Medical Injury Compensation Reform Act of 1975 (MICRA), provides in relevant part that "[i]n an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury *or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first*." (Italics added.) Plaintiffs do not dispute that section 340.5 applies to the medical negligence and wrongful death claims.

The one-year limitation period of section 340.5 is a codification of the discovery rule, under which a cause of action accrues when the plaintiff is aware, or reasonably should be aware, of "injury," a term of art which means "both the negligent cause and the damaging effect of the alleged wrongful act." (*Steketee v. Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 54; see *Knowles v. Superior Court* (2004) 118 Cal.App.4th 1290, 1298-1299 (*Knowles*) [general discovery rule analysis of, inter alia, *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109-1114

13

*(Jolly)* and *Norgart, supra,* at pp. 405-408, apply to section 340.5].) "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period. [Citations.] *Norgart*[, *supra,*] explained that by discussing the discovery rule in terms of a plaintiff's suspicion of 'elements' of a cause of action, it was referring to the 'generic' elements of wrongdoing, causation, and harm. [Citation.] In so using the term 'elements,' we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*).)

The limits of the discovery rule have been restated in many decisions. (See, e.g., *Fox, supra*, 35 Cal.4th at p. 807; *Norgart, supra,* 21 Cal.4th at pp. 397-399; *Jolly, supra,* 44 Cal.3d at pp. 1109-1114.) As summarized in *Fox, supra,* 35 Cal.4th at pages 808-809, the various restatements of the principles lead to a straightforward conclusion: "Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light. In order to adequately allege facts supporting a theory of delayed discovery, the plaintiff must plead that, despite diligent investigation of the circumstances of

14

the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period."

Here, the Hospital contends that the one-year limitation period for the medical negligence and wrongful death claims began running on or about July 26, 2010, because by that date plaintiffs: (1) knew the decedent had died; (2) knew that her face had been disfigured; (3) knew that they had suffered emotional distress from the disfigurement; and (4) suspected wrongdoing by the Hospital. Although not so explicitly phrased by the Hospital, two alternative premises underlie the Hospital's argument.

First, the Hospital assumes that, regardless of the plaintiffs' duty to conduct a reasonable investigation, these listed facts of wrongdoing, causation, and harm (*Norgart, supra,* 21 Cal.4th at p. 397) necessarily constitute the same injury that supports the medical negligence and wrongful death causes of action. Thus, in the Hospital's telling, plaintiffs were aware of their "injury" on or about July 26, 2010, and the statute began to run at that time; whatever plaintiffs could or could not have discovered by a reasonable investigation after that is irrelevant to when the limitation period began. (See *Kleefeld v. Superior Court* (1994) 25 Cal.App.4th 1680, 1684 ["a plaintiff's diligence *after* he has become suspicious of wrongdoing is not relevant to the running of the statute of limitations" and "is only relevant to determine when he *should* have suspected wrongdoing"].) Second, the Hospital implicitly contends, in the alternative, that even if the injury as of July 26, 2010, was not the same as that underlying the medical negligence and wrongful death claims, those claims are still barred because within one year plaintiffs could have discovered through reasonable investigation the factual basis for the claims.

On both counts, the Hospital is wrong. The generic elements – wrongdoing, causation, and harm (*Norgart, supra,* 21 Cal.4th at p. 397) – constituting the injury

15

that plaintiffs reasonably suspected had occurred on or about July 26, 2010 are entirely different from those underlying the medical negligence and wrongful death claims. The injury that plaintiffs reasonably suspected had occurred on or about July 26, 2010, consisted of the mishandling of the decedent's body after death (the wrongdoing), which caused disfigurement to the decedent's face (causation), and plaintiffs' resultant emotional distress upon learning of those post-mortem injuries (the harm). By contrast, the medical negligence and wrongful death claims are based on a wholly different injury raised by diametrically opposed facts. The wrongdoing element of both relates not to mishandling the decedent's remains, but to prematurely declaring her dead and having her placed in the morgue while still alive. The causation element of both relates not to causing post-mortem disfigurement of the decedent's face, but to causing her to freeze to death in the morgue. The harm element of both has nothing to do with emotional distress from knowing of or observing post-mortem injuries. Assuming (without deciding) that the medical negligence claim is a proper survivorship action – meaning a claim that belonged to the decedent but survived her death (*Adams v. Superior Court* (2011) 196 Cal.App.4th 71, 78) – the generic, nontechnical element of harm in that claim is harm caused *to the decedent*, not harm (emotional or otherwise) caused to plaintiffs.[8] As for the wrongful death claim, the relevant harm is the harm which the death caused to the plaintiffs *as the decedents' heirs* – a distinct harm, different

---

[8]  "In the typical survivor action, the damages recoverable by a personal representative or successor in interest on a decedent's cause of action are limited by statute to 'the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement.'" (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1264-1265 (*Quiroz*), quoting section 377.34, italics omitted.)

16

in kind, from emotional distress that might be caused by knowing of or observing the disfiguring of the decedent's remains after death.**⁹** In short, the generic elements (*Norgart, supra,* 21 Cal.4th at p. 397) of the injury plaintiffs suspected on or about July 26, 2010, cannot reasonably be equated to the generic elements of the injury underlying the medical negligence and wrongful death claims.

As we conclude below, in section II of our Discussion, we agree with the Hospital's contention that the alleged negligence in mishandling the decedent's remains, causing disfiguring injuries, is "professional negligence" within the meaning of section 340.5, subdivision (2). But, contrary to the Hospital's argument, that conclusion does not mean that plaintiffs' suspicion of such wrongdoing commenced the limitation period for the medical negligence and wrongful death claims. The Hospital contends that those claims merely embody a different theory of liability under the discovery rule, not a distinct type of wrongdoing. The Hospital's argument, however, ignores the fundamental point that it is the suspicion of the *factual basis* of wrongdoing that commences the limitation period under the discovery rule. Obviously, the factual basis of the wrongdoing that underlies the medical negligence and wrongful death claims (prematurely declaring the decedent dead and placing her in the morgue while alive) is completely different from the factual basis of the wrongdoing plaintiffs

---

**⁹** "Damages awarded to an heir in a wrongful death action are in the nature of compensation for personal injury to the heir. [Citation.] 'A plaintiff in a wrongful death action is entitled to recover damages for his own pecuniary loss, which may include (1) the loss of the decedent's financial support, services, training and advice, and (2) the pecuniary value of the decedent's society and companionship—but he may *not* recover for such things as the grief or sorrow attendant upon the death of a loved one, or for his sad emotions, or for the sentimental value of the loss. [Citations.]' [Citation.] 'The damages recoverable in [wrongful death] are expressly limited to those *not* recoverable in a survival action under Code of Civil Procedure section 377.34. [Citations.]' [Citations.]" (*Quiroz, supra,* 140 Cal.App.4th at p. 1264, fn. omitted.)

17

suspected as of July 26, 2010 (mishandling the decedent's remains, causing disfiguring injuries after death). The difference is not in the theories of liability, but in the essential suspected facts. In short, suspected wrongdoing in handling the decedent's remains after death is not the same as suspected wrongdoing in causing her death.

Thus, the ultimate question is whether it can be said, as a matter of law, that through a reasonable investigation of all the potential causes of the injury suspected on or about July 26, 2010, plaintiffs would have discovered within one year the factual basis for the medical negligence and wrongful death causes of action. (See *Fox, supra,* 35 Cal.4th at p. 809.) Nothing in the complaint compels that conclusion as a matter of law.

According to the complaint, the decedent was declared dead by Dr. Plosay and the Hospital staff, and the body was laid out for viewing by the family. No alleged facts, or inferences compelled from those facts, suggest that plaintiffs' observation of the body should have led them to suspect that the decedent was still alive and that Dr. Plosay and the Hospital staff had prematurely declared her dead. Similarly, no alleged facts, or inferences compelled from those facts, suggest that anything about the discovery of the body lying face down in the refrigerated compartment of the Hospital morgue or the nature of the disfiguring injuries observed by the mortuary workers should have led plaintiffs to suspect that the decedent was alive when placed in the morgue compartment, that she had frozen to death there, or that the disfiguring injuries observed on the body occurred while the decedent was still alive. Moreover, the decedent's death certificate (incorporated into the survivorship declaration of Guadalupe Arroyo and attached to the complaint) later certified that the decedent died on July 26, 2010 at the Hospital,

18

and that the immediate cause of death was cardiac arrest, with subsidiary causes of acute myocardial infarction and hypertension.

Based on the facts in the complaint, read as a whole, plaintiffs had absolutely no reason to suspect that the decedent was alive rather than dead when placed in the Hospital morgue and when the disfiguring injuries occurred, and thus had no reason to suspect or investigate potential wrongdoing by the Hospital or Dr. Plosay in prematurely declaring the decedent dead. While it is true that "[i]t is a plaintiff's *suspicion* of negligence, rather than an expert's *opinion*, that triggers the limitation period," (*Knowles, supra,* 118 Cal.App.4th at p. 1300), here plaintiffs had no reasonable suspicion of the wrongdoing later disclosed by their expert in the mutilation action. And nothing on the face of the complaint (or matters of which we might take judicial notice) compels the conclusion that a reasonable investigation by plaintiffs would have produced the opinion reached by plaintiffs' expert in the mutilation cause of action – that the decedent's injuries were pre-mortem and that she froze to death in the Hospital morgue – sooner than December 8, 2011.

The Hospital analogizes the present case to *Dolan v. Borelli* (1993) 13 Cal.App.4th 816 (*Dolan*), but that decision is inapposite. In *Dolan*, the defendant surgeon performed surgery in April 1985 to alleviate the plaintiff's carpal tunnel syndrome in her right hand. (*Id.* at p. 820.) By June 1985, even though the defendant had told her that he expected the surgery would relieve her pain by then, the plaintiff's symptoms were significantly worse than before surgery, and she believed that the defendant had performed the surgery improperly. (*Ibid.*) In February 1986, she consulted an attorney and complained that the defendant had done something wrong. In June 1986, another surgeon performed surgery on the plaintiff's hand, and discovered that the prior surgery did not release the right

19

carpal tunnel ligament.  Plaintiff did not file suit against the defendant until August 1987.  (*Ibid.*)

The Court of Appeal affirmed the trial court's grant of summary judgment on the ground that the one-year limitation period of section 340.5 began to run no later than February 1986, when the plaintiff consulted an attorney, and therefore the filing of the lawsuit more than one year later in August 1987 was untimely. (*Dolan, supra*, 13 Cal.App.4th at p. 823.)  The appellate court rejected the plaintiff's contention that the negligence alleged in the complaint – defendant's failure to release the carpal tunnel ligament – could not reasonably have been discovered until the second surgery in June 1986, which disclosed that specific condition.  (*Ibid.*)  The court reasoned, as here relevant, that "the essential inquiry is when did [plaintiff] suspect [defendant] was negligent, not when did she learn precisely how he was negligent." (*Id.* at p. 824.)

The Hospital's reliance on *Dolan* exposes the essential flaw in the Hospital's reasoning.  In *Dolan,* the evidence showed as a matter of law that the wrongdoing, with its resultant causation and harm, for which the plaintiff was suing (defendant's negligent performance of the first surgery on plaintiff's hand, resulting in failure to release the carpal tunnel ligament) was the same wrongdoing, causation, and harm which she reasonably suspected had occurred no later than February 1986 (wrongdoing in the performance of the first surgery, resulting in exacerbated pain).  Thus, the one-year limitation period for that injury necessarily commenced in February 1986, and it did not matter whether plaintiff then knew the precise factual parameters of the defendant's negligence.

In the present case, as we have explained, the injury that plaintiffs reasonably suspected had occurred on or about July 26, 2010 (the mishandling of the decedent's remains after death, causing disfiguring injuries and resultant

20

emotional distress to plaintiffs) was not the same injury for which plaintiffs were suing in the medical negligence and wrongful death causes of action (the Hospital's and Dr. Plosay's prematurely declaring the decedent dead and having her placed in a refrigerated compartment in the morgue while still alive where she froze to death, resulting in distinct harm to the decedent and to plaintiffs). The question here, unlike *Dolan,* is whether, as a matter of law, a reasonable investigation of all potential causes of the injury suspected on or about July 26, 2010, would have uncovered within one year a factual basis for the medical negligence and wrongful death causes of action. For the reasons we have stated, we conclude that it would not. Therefore, we cannot say as a matter of law that the one-year limitation period was triggered on or about July 26, 2010, and that it commenced any earlier than December 8, 2011, the date plaintiffs' expert in the mutilation action offered his opinion. Thus, the filing of this action on May 3, 2012 was within the one-year limitation period of section 340.5. It follows that the trial court erred in sustaining the demurrer to the medical negligence and wrongful death causes of action, and we reverse the dismissal of those claims as to the Hospital and Dr. Plosay.

II.     *Negligence Cause of Action*

Plaintiffs contend that the trial court erred in sustaining the Hospital's demurrer to the third cause of action for negligence on the ground that it, too, was barred by the one-year limitation period of section 340.5. According to plaintiffs, section 340.5 does not apply to this claim.

At the outset, we note that although the complaint alleged this claim against both the Hospital and Dr. Plosay, plaintiffs entered a stipulated dismissal of the claim as to Dr. Plosay before the hearing on the Hospital's demurrer to the claim.

21

Plaintiffs do not contend on appeal that the claim should be revived as to Dr. Plosay, and thus we affirm the judgment of dismissal as to him. For the reasons stated below, we also affirm the judgment of dismissal as to the Hospital.

Section 340.5 applies to actions "for injury or death against a health care provider based upon such person's alleged professional negligence." Within the meaning of the statue, the definition of "health care provider" includes "any . . . health facility . . . licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code." (§ 340.5, subd. (1).) In connection with its demurrer to the complaint, the Hospital asked the trial court to take judicial notice of a copy of the Hospital's license issued by the California Department of Public Health in effect at the time of the decedent's death in July 2010, under which the Hospital was certified as, among other things, a general acute care hospital with a capacity of 293 beds.[10] The Hospital also asked the court to take judicial notice of, inter alia, California Code of Regulations, Title 22, section 70829, which provides that hospitals "with a licensed bed capacity of 100 or more shall maintain a well-ventilated morgue with autopsy facilities" (subd. b), and "[r]efrigerated compartments shall be maintained if human remains are held unembalmed" with an air temperature not higher than 45 degrees Fahrenheit (subd. (c)).

Although the record on appeal does not contain an express ruling on the request for judicial notice, plaintiffs concede that the trial court implicitly granted the request. Plaintiffs contend, however, that the court erred in doing so. Of course, in ruling on a demurrer, the court may consider facts that are properly

---

[10] As here relevant, "'[g]eneral acute care hospital' means a health facility having a duly constituted governing body with overall administrative and professional responsibility and an organized medical staff that provides 24-hour inpatient care, including the following basic services: medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy, and dietary services." (Health & Saf. Code, § 1250, subd. (a).)

22

subject to judicial notice, and a "'""complaint otherwise good on its face is subject to demurrer when facts judicially noticed render it defective." [Citation.]' [Citation.]" (*Evans v. City of Berkeley, supra,* 38 Cal.4th at p. 6.)

Here, the Hospital's license issued by the Department of Public Health was properly subject to judicial notice under Evidence Code section 452, subdivision (c), which permits judicial notice of "[o]fficial acts of . . . executive . . . departments . . . of any state of the United States." Similarly, Evidence Code section 452, subdivision (b), permitted the court to take judicial notice of the California Code of Regulations, Title 22, section 70829, as a "[r]egulations . . . issued by or under the authority of . . . [a] public entity in the United States." Together, the facts disclosed by judicial notice showed that by virtue of being a licensed general acute care hospital with a capacity of more than 100 beds, the Hospital was required by administrative regulation to maintain a morgue with refrigerated compartments.

Section 340.5 defines "professional negligence" as "a negligent act or omission by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services *are within the scope of services for which the provider is licensed* and which are not within any restriction imposed by the licensing agency or licensed hospital." (§ 340.5, subd. (2), italics added.) The term "professional negligence" encompasses actions in which "the injury for which damages are sought is directly related to the professional services provided by the health care provider" (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 191 (*Central Pathology*)) or directly related to "a matter that is an ordinary and usual part of medical professional services." (*Id.* at p. 193.) "[C]ourts have broadly construed 'professional negligence' to mean

23

negligence occurring during the rendering of services for which the health care provider is licensed." (*Canister v. Emergency Ambulance Service, Inc.* (2008) 160 Cal.App.4th 388, 406-407 (*Canister*) [holding that "[a]n EMT's operation of an ambulance qualifies as professional negligence when the EMT is rendering services for which he or she is licensed or when a claim for damages is directly related to the provision of ambulance services by the EMT"].)[11]

Here, the negligence claim alleged that the decedent was taken to the Hospital and treated for cardiac arrest, acute myocardial infarction, and hypertension; that shortly after arrival she was pronounced dead; and that (on information and belief) "[d]efendants and each of them, while transporting DECEDENT'S body to [the Hospital's] morgue, or while manipulating DECEDENT'S remains after said transport, negligently placed DECEDENT in a face down position, damaged, lacerated and/or contused DECEDENT'S nose, and various other parts of her head and face." Given that the Hospital's licensed status as a general acute care hospital with a capacity of more than 100 beds required it (by the applicable administrative regulation) to maintain a morgue with refrigerated compartments, the transportation of a deceased patients' remains to the

---

[11] See also the following cases cited in *Canister, supra,* 160 Cal.App.4th at pages 406-407, as examples of professional negligence: "*Palmer v. Superior Court* (2002) 103 Cal.App.4th 953, 957 [negligent recommendation in utilization review]; *Johnson v. Superior Court* [(2002) 101 Cal.App.4th 869, 884–885] [negligence in interviewing and approving sperm bank donor]; *Bellamy v. Appellate Department* (1996) 50 Cal.App.4th 797, 808 [failure to secure rolling X-ray table]; *Williams v. Superior Court* [(1994) 30 Cal.App.4th 318, 323–324] [failure to warn of violent patient]; *Bell v. Sharp Cabrillo Hospital* (1989) 212 Cal.App.3d 1034, 1051–1052 [failure to screen adequately competency of medical staff]; *Murillo v. Good Samaritan Hospital* [(1979) 99 Cal.App.3d 50, 57] [leaving patient unattended and unrestrained on gurney]; see also *Taylor v. U.S.* [(9th Cir. 1987) 821 F.2d 1428, 1432] [negligent disconnection of ventilator, 'regardless of whether separation was caused by the ill-considered decision of a physician or the accidental bump of a janitor's broom'].)"

morgue, and the placement of the remains in a refrigerated compartment, necessarily fall within the scope of the services for which the Hospital is licensed. In other words, such conduct is undoubtedly "an ordinary and usual part of [its] medical professional services." (*Central Pathology, supra,* 3 Cal.4th at p. 193.) Thus, on the face of the complaint and the facts properly subject to judicial notice, plaintiffs' negligence claim based on the Hospital's conduct causing disfigurement to the decedent's remains is directly related to the professional services provided by the Hospital (*id.* at p. 191) and constitutes professional negligence.

Plaintiffs contend that the Hospital's alleged negligence does not meet the definition of professional negligence, because the decedent was dead when the body was mishandled, and thus the conduct was not, within the meaning of section 340.5, subdivision (2), "the proximate cause of a *personal injury or wrongful death*." (Italics added.) According to plaintiffs, section 340.5, subdivision (2), must be construed to refer only to personal injury or wrongful death inflicted on the patient, and not to injuries suffered by third parties as a result of a health care provider's negligence in rendering services for which it is licensed. However, "[b]y their terms, MICRA statutes apply to negligent conduct by a health care provider in the rendering of professional services and is not limited to actions by the recipient of professional services. [Citations.] Indeed, MICRA limitations apply 'to any foreseeable injured party, including patients, business invitees, staff members or visitors, provided the injuries alleged arose out of professional negligence.' [Citation.]" (*Canister, supra,* 160 Cal.App.4th at p. 407.) Here, it is foreseeable that plaintiffs – the husband and children of the decedent – would suffer emotional distress from the disfigurement of the decedent's remains, incapable of being masked by the morgue, caused by the Hospital's negligent

handling of the remains on the way to, or in, the Hospital's morgue. Thus, plaintiffs' negligence claim is covered by section 340.5

"In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows merely that the action may be barred." (*McMahon v. Republic Van & Storage Co., Inc.* (1963) 59 Cal.2d 871, 874.) Here, the complaint is somewhat ambiguous as to when the limitations period began to run on the negligence claim, in that it does not specify a date on which plaintiffs first learned of the disfigurement of the decedent's remains and suspected wrongdoing by the Hospital. It appears that the discovery occurred soon after the decedent was pronounced dead on July 26, 2010, and the mortuary selected by the family arrived at the Hospital to pick up the remains.

Regardless, there can be no doubt that plaintiffs were on notice of facts starting the running of the one-year limitation period of section 340.5 by the time they filed the mutilation action against the Hospital on January 31, 2011. They dismissed that action without prejudice on January 20, 2012, but the pendency of the action did not toll the limitation period. (See *Wood v. Elling Corp.* (1977) 20 Cal.3d 353, 359 [absent applicable statute, the limitation period is not reduced by the "'pendency of an action in which [plaintiff] sought to have the matter adjudicated, but which was dismissed without prejudice to him.'"].) Plaintiffs filed the instant action on May 2, 2012, more than one year after the mutilation action. Thus, it was untimely under section 340.5, and no amendment to the pleading can cure the defect. Therefore, the trial court properly sustained the Hospital's demurrer to the negligence claim without leave to amend.

26

## DISPOSITION

The separate judgments of dismissal are reversed as to the causes of action for medical negligence and wrongful death against the Hospital and Dr. Plosay, and affirmed as to the cause of action for negligence. The parties shall bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, J.



We concur:




EPSTEIN, P. J.




EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.